FILED
2014 JUN -3 PM 3:55
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

JOHN S. HINMAN, State Bar No. 265581
LAW OFFICES OF JOHN S. HINMAN
john@hinmanlawfirm.com
3730 E. Broadway, Suite A
Long Beach, California 90803
Telephone: 562.228.1375
Facsimile: 562.228.1376

Attorneys for Plaintiff KAREN INGRAM

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN INGRAM, an individual<br><br>Plaintiff,<br><br>vs.<br><br>SLOAN D. GIBSON, ACTING SECRETARY OF THE DEPARTMENT OF VETERANS AFFAIRS; MARYANN CHILD; and DOES 1-10, inclusive.<br><br>Defendants. | Case No.: CV14-04276- ODW (RZx)<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED**<br>1. Violation of 42 U.S.C. 2000e-16, et seq.<br>2. Violation of 42 U.S.C. 2000e-3<br>3. Intentional Infliction of Emotional Distress<br><br>**BY FAX** |

Plaintiff, KAREN L. INGRAM, hereby alleges as follows:

### JURISDICTION & VENUE

1. This action is brought in the United States District Court under 42 U.S.C. § 2000e-16, et seq. The jurisdiction of this Court is predicated on 28 U.S.C. § 1331. This Court has concurrent jurisdiction over the state claims herein.

2. Venue is proper under 42 U.S.C. § 2000e-5(f) because the unlawful employment practices occurred in the District.

---
1
COMPLAINT FOR DAMAGES

**DEMAND FOR JURY**

3.  Plaintiff hereby demands and reserves the right to a trial by jury.

**PARTIES**

4.  Plaintiff Karen Ingram is, and at all relevant times was, a citizen of California, residing in the County of Los Angeles, California.

5.  Defendant Sloan D. Gibson is sued in his capacity as the Acting Secretary of the Department of Veterans Affairs pursuant to 42 U.S.C. § 2000e-16(c).

6.  Defendant MaryAnn Child, is and at all relevant times was, was a citizen of California, and based on information and belief residing in the County of Los Angeles, California.

7.  Plaintiff is unaware of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants proximately caused damages to plaintiff as alleged herein and/or is otherwise responsible for the acts complained of herein. Plaintiff will amend this Complaint to allege the true names and capacities of each DOE defendant when ascertained.

8.  Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the named defendants and defendant DOES 1-10, inclusive, acted in concert with the other defendants and/or were agents, servants, and employees of the co-defendants, and at all relevant times were acting within the scope of their authority of such agents, servants and employees, and with the permission and consent of their co-defendants, each of whom ratified the conduct of their co-defendants.

/ / /

/ / /

/ / /

## PRE-LAWSUIT FILINGS

9. On February 19, 2013, plaintiff filed a formal EEO complaint alleging discrimination against officials at the VA Long Beach Healthcare System in Long Beach, California. After investigation by the Department of Veterans Affairs, plaintiff requested a final agency decision on October 29, 2013.

10. On March 5, 2014, a final agency decision was rendered, finding no discrimination based on race had occurred based on the issues raised by plaintiff's complaint.

11. Plaintiff received the final agency decision on March 14, 2014.

## FACTUAL ALLEGATIONS

12. Plaintiff, Karen Ingram (hereinafter "Nurse Ingram") is, and at all relevant times was, a registered nurse and licensed nurse practitioner in the State of California. She was first licensed as a registered nurse in 1996 and was first licensed as a nurse practitioner in 2003. Since those dates, both her licenses have been maintained in active status and no disciplinary action has been taken against her by the California Nursing Board. At all relevant times, Nurse Ingram had a Masters of Science in Nursing degree and has also taken significant course work towards further advanced degrees.

13. Nurse Ingram began working as a contract nurse practitioner within the VA Long Beach Healthcare System (hereinafter "LBHCS") in 2004.

14. In June 2005, Nurse Ingram was hired by the VA Greater Los Angeles Healthcare System as a full-time nurse case manager in the West Los Angeles Medical Center.

15. In July 2007, Nurse Ingram was hired/transferred back to the LBHCS as a nurse supervisor. She reported to the Nurse Chief of Primary & Specialty Care Services and supervised approximately 30 employees including registered nurses, LVNs and clerks. Nurse Ingram successfully worked in that role from July 2007 until November 2012.

16. During this timeframe, in addition to her success as a nurse supervisor, Nurse Ingram was an active participant in extracurricular activities, including several local and national committees. At various times she was the chair of the telephone committee and also co-chaired the pain management committee, where she authored the LBHCS pain management policies that were approved and implemented at the LBHCS.

17. Nurse Ingram also received a performance related bonus in 2010 and received a promotion in 2011. In total, Nurse Ingram was a highly successful nurse supervisor with the LBHCS.

18. In June 2010, a new Nurse Chief, MaryAnn Child, became Nurse Ingram's manager. From June 2010 until Nurse Ingram's termination on March 20, 2014, Ms. Child conducted a campaign of discrimination and retaliation against Nurse Ingram that led to the destruction of Nurse Ingram's previously successful career.

19. Ms. Child is Caucasian and she is in a personal romantic relationship with a Filipino who is also an employee and nurse within the LBHCS. As a result of her personal relationship, Ms. Child has a preference towards Filipinos, and more broadly Asian-Pacific Islanders, which exhibits itself in workplace favoritism towards those employees and hires of that race/ethnicity. Ms. Child also has a bias against African-Americans, who receive disfavored treatment from her in the workplace. Nurse Ingram is African-American.

20. Ms. Child directly supervised Nurse Ingram from June 2010 through November 14, 2012. During this timeframe, Ms. Child's discrimination was evident based on broad examples of behavior towards all staff she managed as well as specifically in the manner in which she treated Nurse Ingram.

21. Ms. Child's discrimination was displayed by the disparate treatment and impact on the racial profile of the nurse supervisors under her control. At the time she took as Nurse Chief, there were three full time nurse supervisors, all of whom were women. Two were African-American and one was Caucasian/Hispanic. Each of

4
COMPLAINT FOR DAMAGES

these nurse supervisors had significant experience and had been successful or highly successful in their roles before Ms. Child. By the time Nurse Ingram was removed from her role, only two years later, each of the original nurse supervisors had left their roles and they had been replaced by approximately five nurse supervisors, all, or a majority, of whom were of Filipino and/or Asian-Pacific Islander descent.

22. Ms. Child's discrimination was also displayed in the disparate treatment and impact in the racial profile of the employees working in the outpatient clinics under her control. In one clinic alone, the two African-American nurses who worked in the clinic, who had been successful employees before Ms. Child took over, were gone from their positions within two years. The only African-American physician in that clinic also left.

23. Ms. Child also exerted her influence to have Filipino and/or Asian-Pacific Islander nurses hired into open nursing and staff positions in the clinics as often as possible. As a result, nurses and staff with that racial background were hired in the clinics under Ms. Child's supervision and control in disparate numbers. Often these decisions were made by Ms. Child without consulting, or in direct conflict with the advice of, her nurse supervisors whom would normally be responsible for the hiring decisions.

24. Ms. Child's discriminatory practices were also displayed in the manner in which she exerted influence over the annual performance reviews of employees. In one prominent example, Ms. Child unilaterally changed the performance review given by Nurse Ingram to an African-American nurse under Nurse Ingram's supervision. Nurse Ingram had rated the highly experienced and successful nurse as Exceptional, which would have entitled the nurse to a performance bonus. Ms. Child had virtually no personal interaction with the nurse or knowledge of the nurse's performance, yet she lowered the annual review so that the African-American nurse would not receive

/ / /

/ / /

1  an annual bonus that she had earned.  Ms. Child also exerted similar influence to have
2  an annual review of a successful, but young and relatively inexperienced, Filipino
3  nurse raised to Exceptional so that the nurse would receive a performance bonus.

4      25. Ms. Child also exerted additional criticism and oversight over the
5  workplace performance of African-American nurses, supervisors and other staff under
6  her supervision.  She was more critical of their performance and more apt to raise
7  performance issues with them that would not be an issue for an employee of other
8  races.  Likewise, Ms. Child often overlooked the poor performance or workplace
9  issues of Filipinos and/or Asian-Pacific Islanders, such that they often received more
10 lenient treatment from Ms. Child.

11     26. In total, Ms. Child treated African-American employees differently to their
12 detriment and treated Filipino and Asian-Pacific Islander employees differently to
13 their benefit, and to the detriment of those of other racial backgrounds.  Nurse Ingram
14 was one of those employees who the disparate treatment detrimentally impacted the
15 most.

16     27. Specifically as it relates to Nurse Ingram, Ms. Child was often
17 unprofessional and harassing in the manner in which she addressed Nurse Ingram.
18 She made comments about the amount of Nurse Ingram's salary, in comparison to Ms.
19 Child's own salary, a comment that Nurse Ingram reasonably interpreted to be related
20 to Nurse Ingram's race.  She often raised her voice at Nurse Ingram and made
21 demeaning and belittling comments.  Nurse Ingram reasonably interpreted that this
22 workplace harassment was motivated by her race.

23     28. Although her job performance remained at the same high level it had been
24 for the prior four years in the job, Nurse Ingram's annual performance reviews also
25 began to decline under Ms. Child.  The 2010 rating, based on the evaluation of the
26 Nurse Chief before Ms. Child, was Exceptional.  In 2011, although she received a
27 promotion due to the input of the next-level supervisor, Nurse Chief of Patient Care
28 Services, John Tryboski, Nurse Ingram's performance review digressed to Fully

Successful. The annual review reveals only positive commentary about Nurse Ingram's accomplishments that year, without a single negative comment, revealing the racially motivated lowered score. As a result, Nurse Ingram raised her discrimination concerns with Mr. Tryboski for the first time. He was dismissive of the concerns and did nothing to remedy the discriminatory practices of Ms. Child other than to encourage the two employees to informal "mediation."

29. Two informal "mediation" sessions in Spring of 2012 accomplished nothing other than to put Ms. Child on notice that Nurse Ingram had reported her discrimination. As a result, Ms. Child's actions thereafter were also motivated by retaliation, as she continued her campaign against Nurse Ingram.

30. As a result, Ms. Child upped her harassment of Nurse Ingram and increased her unreasonable criticism of Nurse Ingram's performance. She actively withheld workplace support from Nurse Ingram that Ms. Child should have provided in her role as Nurse Ingram's direct supervisor. This included that Ms. Child also actively withheld critical information and documents that were communicated to her by Mr. Tryboski, with instructions to pass the information on to Nurse Ingram. By failing to communicate this critical information, Ms. Child actively set up Nurse Ingram to fail in critical aspects of Nurse Ingram's job. Instead of supporting Nurse Ingram, Ms. Child was hypercritical of her, forcing Nurse Ingram to constantly waste time defending herself and addressing Ms. Child's complaints, all of which was a distraction from carrying out her duties. All of this was designed by Ms. Child to set up Nurse Ingram to fail and in an effort to have Nurse Ingram terminated.

31. By the mid-year 2012 review, on June 1, 2012 Nurse Ingram was given a less than fully-successful rating for the first time in her career. Again, this change in Nurse Ingram's performance reviews was not related in any manner to her actual performance or abilities, but rather Ms. Child's discrimination.

///

///

32. As a result of this mid-year review, Ms. Child gave Nurse Ingram a "Counseling Program," with areas of needed improvement. Although this document was presented to Nurse Ingram, the title and format were misleading as they fell far short of the requirements for a "Performance Improvement Plan." This distinction was important, and deliberate on the part of Ms. Child, because a performance improvement plan, and failure of that plan, would be required prior to any adverse workplace action against Nurse Ingram according to VA regulations. Ms. Child's omission of critical features and mislabeling of the document misled and disguised from Nurse Ingram the seriousness of the counseling plan, all in an effort to undermine Nurse Ingram and have her fired.

33. Thereafter, Ms. Child instructed Nurse Ingram to meet with her weekly to discuss Nurse Ingram's performance. Because Ms. Child was unprofessional and abusive manner with Nurse Ingram when they were in private, and could not be trusted to accurately report what was discussed, Nurse Ingram insisted that she be allowed to either record their conversations or have an HR representative present at the meetings. Revealing her motivation and ill intent, Ms. Child refused and became very angry, insisting that they meet in private. This response scared Nurse Ingram even more that Ms. Child had evil intent, so Nurse Ingram again insisted. When Ms. Child refused to have the conversations recorded or a witness present, Nurse Ingram did not attend the meetings. Although many subsequent meetings were either cancelled or not scheduled by Ms. Child, she alleged that Nurse Ingram had failed to follow her instructions and used this allegation as a cornerstone of Ms. Child failing Nurse Ingram on her "counseling plan."

34. On September 4, 2012, Nurse Ingram took sick leave for evaluation of a medical condition. She was then diagnosed by her physicians that with a serious medical issue that required immediate treatment and she did not return to work. On September 20, 2012, her sick leave was converted into a Family Medical Leave.

35. Also in September 2012, Ms. Child prepared a document entitled "Counseling Program/Performance Improvement Program Review" for Nurse Ingram. This document purported to be the results of Nurse Ingram's counseling plan, however it was never presented to Nurse Ingram at the time. On this document, Ms. Child essentially failed Nurse Ingram on each of the nine issues, as well as added five new issues that were not addressed in the initial counseling plan and failed Nurse Ingram on each of those as well. Ms. Child had deliberately changed the nature of Nurse Ingram's counseling plan into a performance improvement plan, and had failed to give Nurse Ingram notice of the document, all in violation of VA policies and in a continuation of Ms. Child's plan to have Nurse Ingram terminated.

36. On November 14, 2012, Nurse Ingram returned from Family Medical Leave Act leave. On that date, she was handed a memorandum by Ms. Child that stated that she was being temporarily reassigned to the Nursing Education Service and that she would no longer have supervisory responsibilities in this temporary assignment. Although it did not contain a change in title, pay, or benefits, because it substantially changed the duties and responsibilities for Nurse Ingram, and took her out of a position that was still available, it was a material workplace change.

37. On November 20, 2012, Nurse Ingram received a memorandum from Mr. Tryboski, changing her supervisor during her temporary reassignment to Ms. Webb.

38. As a result of receiving these documents, Nurse Ingram finally realized the extent of Ms. Child's plan against her. She initiated the informal EEO process, and when that was unsuccessful, she filed her formal EEOC complaint on February 19, 2013.

39. On December 13, 2012, Ms. Child issued Nurse Ingram's ECF annual performance appraisal for the period of October 1, 2011 through September 30, 2012, although Nurse Ingram did not attend the meeting to obtain the review. Ms. Child

///

///

rated Nurse Ingram less than fully successful in every material respect. This was the first and only time that Nurse Ingram had ever received a less than fully successful mark on any annual review with the VA.

40. Throughout 2013, Nurse Ingram remained in a sort of limbo, in her temporary reassignment with supervision by Ms. Webb. She completed special projects at the direction of Ms. Webb and Mr. Tryboski and had virtually no interaction with Ms. Child, who no longer had supervision over her.

41. On May 31, 2013, Nurse Ingram had a mid-year performance review by Ms. Webb, who rated her Fully Successful or better.

42. On October 31, 2013, Nurse Ingram received her annual ECF performance appraisal and again was rated as fully successful in every category by Ms. Webb. The increase in her performance review was no indicative of an increase of Nurse Ingram's workplace performance, which had always been high, rather that she had been moved out from under the discriminatory control of Ms. Child.

43. On January 13, 2014, more than a year since Ms. Child had last supervised Nurse Ingram and despite the fact that Nurse Ingram had been fully successful in her new role, Nurse Ingram received from Ms. Child a notice of proposed discharge, containing five material issues, with 26 specific examples. This document was the culmination of Ms. Child's discrimination and retaliation against Nurse Ingram. The document, in combination with the prior documentation or lack thereof, failed to meet many of the VA policies regarding performance related workplace discipline. It represented more than three years of Ms. Child's efforts to have Nurse Ingram terminated motivated by Nurse Ingram's race and retaliation against Nurse Ingram.

42. As a result of this notice of proposed discharge, despite Nurse Ingram's best efforts to fight it, she was given a notice of discharge on March 20, 2014, with an effective date of discharge of March 28, 2014. As a result, in an effort to save some

///

grace and dignity and preserve her retirement benefits, Nurse Ingram tendered her resignation on March 25, 2014, given that her employment had been effectively terminated by the VA.

43. In total, Nurse Ingram was fired as a direct and determinative result of Ms. Child's discrimination against African-Americans and towards Filipinos and Asian-Pacific Islanders, which was revealed in the specific manner in which she was treated as well as the broad manner in which other employees at the VA under Ms. Child's supervision and control were treated.

## FIRST CAUSE OF ACTION

*Unlawful Employment Discrimination in Violation of*

*42 U.S.C. § 2000e-16 et seq.*

(Against Defendant Gibson)

44. Plaintiff incorporates herein by reference the foregoing allegations in Paragraphs 1-43 as though set forth fully herein.

45. Title 42 U.S.C. § 2000e-16(a) provides, in pertinent part: All personnel decisions affecting employees or applicants for employment…[in any Executive Department]…shall be made free from any discrimination based on race, color, religion, sex or national origin.

46. Title 42 U.S.C. § 2000e-16(c), in conjunction with 42 U.S.C. § 2000e-5, provides for a civil action by any employee who has been subjected to unlawful employment discrimination to bring a civil action within 90 days of receipt of notice of a final action on an EEO complaint.

47. Plaintiff, Nurse Ingram, was subjected to unlawful discrimination towards the terms or conditions of her employment in violation of 42 U.S.C. § 2000e-16(a) when employment decisions made by her direct superior, Ms. Child, were motivated by her race, namely that she was African-American and not Filipino or Asian-Pacific Islander. As a direct result of Ms. Child's racially based discrimination, Nurse

///

11

COMPLAINT FOR DAMAGES

Ingram, who was otherwise well qualified for and performing competently in her position, was treated differently than similarly situated employees who did not experience unlawful discrimination.

48. Nurse Ingram's race was the determinative factor in Ms. Child's decision to: 1) lower her annual performance reviews; 2) remove her from her supervisorial responsibilities; 3) place her on a "counseling program," and 4) to ultimately discharge Nurse Ingram from her employment.

49. As a direct and proximate result of suffering the unlawful employment discrimination, Nurse Ingram has suffered, and will continue to suffer into the future, a loss of salary and other benefits of employment in amounts to be ascertained according to proof at trial.

50. As a further direct and proximate result of suffering the unlawful employment discrimination, Nurse Ingram has suffered injuries to her person, including humiliation, anxiety, depression, shame, embarrassment, worry, fear, anguish, shock, nervousness, and loss of reputation, in amounts to be ascertained according to proof at trial.

51. In addition to the damages described above, plaintiff requests attorneys' fees, costs, reinstatement, injunctive relief and compensatory damages including past and future general damages and past and future special damages for loss of earnings and benefits in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

*Unlawful Retaliation in Violation of*

*42 U.S.C. § 2000e-3 et seq.*

(Against Defendant Gibson)

52. Plaintiff incorporates herein by reference the foregoing allegations in Paragraphs 1-51 as though set forth fully herein.

/ / /

/ / /

COMPLAINT FOR DAMAGES

53. Title 42 U.S.C. § 2000e-3(a) provides, in pertinent part: It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

54. Title 42 U.S.C. § 2000e-5, provides for a civil action by any employee who has been subjected to unlawful employment retaliation to bring a civil action within 90 days of receipt of notice of a final action on an EEO complaint.

55. Nurse Ingram engaged in protected EEO activity by: 1) making informal complaints in opposition to racially based workplace discrimination by Ms. Child; and 2) filing a formal EEO complaint against Ms. Child.

56. As a direct result of Nurse Ingram's protected activity, which Ms. Child was informed of, Ms. Child retaliated against Nurse Ingram, resulting in adverse employment actions culminating in the termination of Nurse Ingram from her position.

57. As a direct and proximate result of suffering the unlawful retaliation, Nurse Ingram has suffered, and will continue to suffer into the future, a loss of salary and other benefits of employment in amounts to be ascertained according to proof at trial.

58. As a further direct and proximate result of suffering the unlawful retaliation, Nurse Ingram has suffered injuries to her person, including humiliation, anxiety, depression, shame, embarrassment, worry, fear, anguish, shock, nervousness, and loss of reputation, in amounts to be ascertained according to proof at trial.

59. In addition to the damages described above, plaintiff requests attorneys' fees, costs, reinstatement, injunctive relief and compensatory damages including past and future general damages and past and future special damages for loss of earnings and benefits in an amount to be proven at trial.

/ / /

## THIRD CAUSE OF ACTION

*Intentional Infliction of Emotional Distress*

(Against Defendant Child)

60. Plaintiff incorporates herein by reference the foregoing allegations in Paragraphs 1-59 as though set forth fully herein.

61. The conduct of Ms. Child, as set forth above, including obvious and deliberate discrimination and harassment based on race, was outrageous and intended, or with reckless disregard of the probability, that it would cause severe emotional distress to Nurse Ingram.

62. Nurse Ingram suffered severe emotional distress including humiliation, anxiety, depression, shame, embarrassment, worry, fear, anguish, shock and nervousness as a direct and proximate result of Ms. Child's conduct.

63. As a direct and proximate result of Ms. Child's conduct, Nurse Ingram has suffered, and will continue to suffer into the future, a loss of salary and other benefits of employment in amounts to be ascertained according to proof at trial.

64. As a further direct and proximate result of Ms. Child's conduct, Nurse Ingram has suffered injuries to her person, including humiliation, anxiety, depression, shame, embarrassment, worry, fear, anguish, shock, and nervousness in amounts to be ascertained according to proof at trial.

65. In addition to the damages described above, plaintiff requests costs, reinstatement, injunctive relief and compensatory damages including past and future general damages and past and future special damages for loss of earnings and benefits in an amount to be proven at trial.

66. Further, Ms. Child engaged in her conduct with malice, oppression and fraud, intending and with willful disregard of the likelihood to cause Ms. Ingram her injuries. Ms. Child's conduct of racially motivated discrimination was despicable and caused Nurse Ingram to suffer a cruel and unjust loss of her career and other injuries. Therefore, Nurse Ingram is also entitled to punitive damages against

14
COMPLAINT FOR DAMAGES

defendant Child in an amount sufficient to punish defendant Child and deter others from like conduct.

## PRAYER FOR RELIEF

Plaintiff prays for judgment as follows:

1. For judgment against each defendant in a sum sufficient to compensate plaintiff for her special and general damages legally caused by that defendant's acts and omissions, and/or for joint and several liability as to those defendants acting in concert, including but not limited to past and future loss of salary, wages and other benefits (medical, retirement, vacation, pension, sick leave, etc.), and past and future emotional and mental pain and suffering, emotional distress, mental anguish, shame, fear, intimidation, humiliation, embarrassment, loss of enjoyment of life, loss of confidence, loss of self-esteem, loss of reputation, loss of good name, loss of chosen profession and occupation, in sums according to proof;

2. For prejudgment interest at the maximum rate permitted by law;

3. For punitive and exemplary damages as to each Defendant, except City of Calexico, who is found to have acted with fraud, malice, oppression, or in reckless or conscious disregard for plaintiff's health and rights in an amount sufficient to punish or deter similar future conduct;

4. For recovery of attorney's fees to the full extent permitted by law;

5. For costs of suit incurred in this action;

6. For a trial by a jury of plaintiff's peers;

7. For such other relief as the Court may deem just.

DATED: 6/3/14                    LAW OFFICES OF JOHN S. HINMAN

By: _____
John S. Hinman
Attorneys for Plaintiff
john@hinmanlawfirm.com